UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

OLIVIA FORDE,                              :

               Plaintiff,          :

      - against -                   :

BETH ISRAEL MEDICAL CENTER and            :
STEVEN ARSHT, M.D., individually,

                      :

              Defendants.        :

- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _4/22/2008_

**OPINION**

06 Civ. 901 (DC)

**APPEARANCES:**    LAW OFFICES OF LEE NUWESRA
                    Attorneys for Plaintiff
                        By:  Lee Nuwesra, Esq.
                    60 East 42nd Street, Suite 838
                    New York, New York  10017

                    EDWARDS ANGELL PALMER & DODGE LLP
                    Attorneys for Defendants
                        By:  Rory J. McEvoy, Esq.
                                Jason R. Bogni, Esq.
                    750 Lexington Avenue
                    New York, New York  10022

**CHIN, District Judge**

        Plaintiff Olivia Forde alleges that her former employer, Beth Israel Medical Center ("Beth Israel"), and supervisor, Dr. Steven Arsht, unlawfully terminated her employment one week after she announced her pregnancy.  She sues under federal, state, and city law.  Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons that follow, the motion is granted and the amended complaint is dismissed.

## BACKGROUND

### A.    Facts

The facts are drawn from the affidavits, depositions, and parties' Rule 56.1 statements.[1]  For purposes of this motion, the facts are construed in the light most favorable to Forde as the party opposing summary judgment, and conflicts in the evidence have been resolved in her favor where reasonably possible.

I also note at the outset that several assertions made in Forde's sworn affidavit directly contradict her deposition testimony.[2]  Where there are such discrepancies, I disregard the affidavit and rely on the deposition testimony.  Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.") (internal citations omitted).

### 1.    The Parties

Arsht is an attending orthopedic surgeon in Beth Israel's Petrie Division.  (Arsht Dep. at 9; see also Lee Aff.

---

[1]    I cite to defendants' 56.1 statement only where plaintiff does not dispute the fact in question.

[2]    For instance, Forde attests in her declaration that until July, "the scheduling of patients' surgery [sic] was part of Ms. Potts' responsibilities."  (Forde Decl. ¶ 14).  At her deposition, however, Forde stated that she scheduled surgeries during the entire time that she was employed as Arsht's office manager.  (Forde Dep. at 61).

Ex. 14).  Forde was employed at Beth Israel as Arsht's office manager from February to August 2005.  (Forde Dep. at 30-31).

Prior to working in Arsht's practice, Forde was the senior secretary in the orthopedics department at Beth Israel's North Division.  (Id. at 6, 8).  She was promoted twice, first to administrative assistant for Dr. Norman Scott, and then to executive assistant.  (Id. at 13-14, 16).  In 2004, Dr. Scott's practice at Beth Israel was sold, and Forde was laid off.  (Id. at 19-20).  In November 2004, Dr. Scott's new practice hired Forde as an executive assistant.  (Id. at 23).

### 2.  Forde Becomes Arsht's Office Manager

In January 2005, Forde applied for an office manager position at Beth Israel.  (Id. at 21).  After a phone interview with Arsht and an in-person interview with Ken Handler, who was then the assistant director of recruitment at Beth Israel, Forde was hired as Arsht's office manager.  (Id. at 27, 32).  She began working on February 14, 2005.  (Id. at 33).

Forde reported to Arsht, who was the only person to give her assignments.  (Id. at 40).  Her duties included, among other things, handling the finances and billing, scheduling surgeries, filing transcripts of dictations in patients' charts, checking patient referrals, and responding to requests for medical records.  (Id. at 41, 55, 57, 76; see also Handler Dep. at 49).  If Arsht had other tasks for her, he would email Forde or talk to her in person.  (Forde Dep. at 41).

Forde also interacted daily with Danielle Kurlander, Arsht's physician assistant.  (Id. at 43).  Forde was responsible

-3-

for giving Kurlander telephone messages and patients' MRI
results.  (Id. at 43-44).

   3.   **Forde's Work Performance**

        Arsht, Kurlander, and Emily Bahr, who was then the
orthopedic surgery practice manager, found deficiencies in
Forde's performance virtually from the beginning.  (See, e.g.,
Arsht Dep. at 88; Kurlander Dep. at 35, 49; Bahr Decl. ¶ 3).
According to Kurlander, Forde failed to perform the essential
functions of her job, such as filing transcripts, answering
requests for medical records, and most importantly, scheduling
and clearing patients for surgeries.  (Kurlander Decl. ¶¶ 2, 3;
see also Kurlander Dep. Ex. 1[3]).  Some patients were given the
wrong dates for their surgeries, while others were not scheduled
for surgery in a timely manner.  (Kurlander Dep. Ex. 1).  Forde
also failed to check for medical clearances as part of the pre-
operation protocol, thereby requiring patients to postpone their
surgeries or see their doctors at the last minute.  (Id.; see
also Def. 56.1 ¶ 29; Pl. 56.1 ¶ 29).

        Arsht received numerous complaints from patients, the
orthopedic nurse manager, social workers, the billing company,
the transcription company, and law firms about their difficulties
in dealing with his office, most of which arose from Forde's

---

        [3]    Kurlander drafted a memorandum regarding Forde's
performance problems at the request of Beth Israel's in-house
counsel.  Kurlander testified about the contents of the
memorandum at her deposition and in her declaration.  (Kurlander
Dep. at 40; Kurlander Decl. ¶ 2).

failure to perform her duties. (Kurlander Dep. Ex. 1; Arsht Decl. Exs. A, B). In addition to memos and emails circulated among Arsht, Bahr, and Kurlander noting complaints they had received firsthand from patients, the record contains written complaints from one patient, a patient representative at Beth Israel, and three law firms. For instance, one patient complained that three weeks after his appointment, he still had not received pre-certification for an MRI. (Arsht Decl. Ex. G). Law firms often needed to send multiple requests for medical records, and one firm in particular warned that it would subpoena the records if the office did not comply with its third request. (Id. Ex. B).

Sometime in the early summer, Handler received a voice mail from Arsht "voicing a few concerns with the work performance of Ms. Forde."[4] (Handler Dep. at 102). Arsht sought Handler's advice "on how to proceed and what he should do" about Forde's performance problems. (Id.). Handler explained to Arsht that because Forde was in the middle of her probationary period,[5]

---

[4] Handler testified that to the best of his recollection, Arsht had left the voice mail in April (Handler Dep. at 102), but Arsht testified that he did not call Handler until June (Arsht Dep. at 93-94). It is undisputed, however, that Arsht contacted Handler numerous times in June and July. (See Def. 56.1 ¶ 52; Pl. 56.1 ¶ 52).

[5] The parties dispute whether Forde was still a probationary employee when she was fired. Forde contends that she was a "re-hire" who was subject only to a three-month probation period. Defendants contend that she was a "new hire" subject to a six-month probation period. I need not resolve this dispute, for even if Forde was no longer on probation when she was dismissed, she was still an at-will employee who could be discharged for any non-discriminatory reason or no reason at all.

-5-

disciplinary action was not required before terminating her
employment.  (Id. at 102-03, 113-15).  Although he referred Arsht
to the labor relations department, Handler continued to receive
calls from Arsht complaining about Forde.  (Id. at 109-11, 120).
Handler testified that he received approximately twenty such
calls.  (Id. at 120-21).

Beginning in June, Arsht began emailing Forde with
specific instructions about her duties:

> Filing:  I know you [and Yelena Fuentes, the
> secretary] are behind.  While I am away, I
> would like all outstanding notes in the
> charts.  I have been seeing patients without
> their previous notes and it is difficult.

(Forde Dep. Ex. 14 (email from Arsht to Forde (Jun. 20, 2005,
7:12 a.m.))).

> [The billing company] need[s] the office
> dictations on [name redacted,] and because
> they were not sent, [the company is] sending
> the whole [packet] back.  This results in
> more delay.  If you do not have the
> dictation, you need to call the
> transcriptionist and get it. [M]any of
> thes[e] things are time sensitive and if not
> filed in a certain time, get denied.

(Id. Ex. 17 (email from Arsht to Forde (Jul. 7, 2005, 7:22
a.m.))).

> I have been finding over the past several
> months superbills[6] that were never sent.
> Please make sure they have all been sent.  I
> would recommend pulling the charts and
> resending everything.  We need to sit down
> this week and figure out a better way to do

---

[6]     A superbill is a document submitted with the billing,
which "explains what the patient was seen for that day"; it
contains "the procedures that were constructed that day, as well
as a diagnosis and treatment plan."  (Forde Dep. at 57-58).

this because there has been a bunch of stuff
fall through the cracks.

(Id. Ex. 18 (email from Arsht to Forde (Jul. 10, 2005, 9:21

p.m.))).

        In July, Arsht also began emailing Handler and Bahr

with complaints:

        My dictations have been getting messed up.  I
        asked Olivia about this data in particular
        and she blamed it on the transcriptionist.  I
        have been working with Kay and Linda this
        afternoon to find out what has been going on,
        basically we have traced the problem back to
        Olivia not doing things correctly.  We will
        add this to the list of things not being
        done.  The transcriptions are returned within
        48-72 hours tops.  There should be no excuse
        that patients I have seen in the beginning of
        July still do not have notes in their charts.

(Arsht Decl. Ex. I (email from Arsht to Bahr (Jul. 26, 2005, 3:15

p.m.))).

        I have emailed [Forde] several times and she
        did not respond.  I know her email is working
        because she sent me one as she was leaving.
        I had emailed her earlier and requested that
        she respond to my emails so I know that she
        gets them.  She failed to respond even to
        that email.  I have put a call out to [K]en
        [H]andler.  If [Forde] continues to be
        insubordinate then I would like to have her
        fired.

(Id. Ex. K (email from Arsht to Bahr (Jul. 26, 2005, 4:36

p.m.))).

        I feel that I have to address Olivia and
        Yelena again but do not want to do so without
        first conferring with you. . . . I am
        actually very disappointed by the recent turn
        of events and how things have worked out in
        general.  I never would have expected it.

(Id. Ex. L (email from Arhst to Handler (Jul. 27, 2005, 7:12

a.m.))).

Forde contends that she performed her job satisfactorily. (Forde Dep. at 57, 77). Furthermore, Forde explains that when she first started working for him, Arsht had not had a permanent office manager for two months. (Id. at 171-72). In addition, the secretarial position was filled by a temporary employee until June, when Yelena Fuentes was hired. (Id. at 38-39). The prolonged absence of a permanent staff resulted in a backlog of requests for medical records and transcripts that needed to be filed. (Id. at 171-72). Forde testified that she finally caught up on all of the paperwork by the beginning of July. (Id. at 173). The record, however, shows that Arsht received at least eight complaints from patients, law firms, and others in July and August. (See, e.g., Arsht Decl. Exs. B, G, I, O, Q).

**4.    The July 19 Meeting**

The parties dispute whether Arsht held a staff meeting on July 19 to discuss Forde's work performance issues. Defendants assert that Arsht, Kurlander, Bahr, Forde, and Fuentes attended the meeting and that Arsht informed Forde that if her performance did not improve, then she was "at risk of being terminated." (Bahr Decl. ¶ 6; see also Arsht Decl ¶ 7; Kurlander Decl. ¶ 4). Forde claims that there was no meeting on July 19 because Arsht was in Florida during the week of July 18. (Forde Dep. at 121).

Defendants, however, have submitted the declarations of a nurse, three physician assistants, and three anesthesiologists

attesting that they performed surgery with Arsht that week.
(Kurlander Decl. ¶¶ 6-8; Lalli Decl.; Tissot Decl.; Machernis
Decl.; Waxman Decl.; Friedman Decl.; Bautista Decl.).  Each
declarant submitted "operation room logs," "brief operative
notes," or "anesthesia/pain management records," indicating that
Arsht performed surgeries on July 18, 19, and 20.  (Kurlander
Decl. Ex. 1; Lalli Decl. Exs. A-D; Tissot Decl. Exs. A-B;
Machernis Decl. Ex. A; Waxman Decl. Exs. A-B; Friedman Decl. Exs.
B-C; Bautista Decl. Exs. A-B).  Six completed "request and
authorization for operation" forms -- signed by the patient,
Arsht, and a witness (in these cases, the physician assistant) on
the day of the procedure -- show that Arsht, indeed, performed
surgeries at Beth Israel on those dates.  (Kurlander Decl. Ex. 2;
Friedmand Decl. Ex. A).

     All of the evidence submitted by defendants demonstrate
that Arsht was present at Beth Israel on July 19.  In addition,
Arsht, Bahr, and Kurlander attested under oath that a staff
meeting was held, at which Forde was given a warning that if she
did not show improvement, she would lose her job.  (Arsht Decl ¶
7; Bahr Decl ¶ 6; Kurlander Decl. ¶ 4).  Furthermore, Arsht has
produced a three-page outline that he swears he wrote at the
time, listing items to discuss at the meeting, most of which
dealt with performance issues and suggestions for improvement.
(Arsht Decl. ¶ 7 & Ex. D).  Although Forde denies having attended
such a meeting, her denial is based largely on her assertion that
Arsht was on vacation on the day in question.  In light of

defendants' incontrovertible evidence proving that Forde's assertion is wrong, as well as the evidence in the form of declarations and exhibits indicating that the meeting did occur, a reasonable jury could only find that Forde attended the meeting at which her performance issues were discussed.[7]

### 5.  **Forde Learns She Is Pregnant**

While at work on June 29, Forde felt dizzy and vomited. (Forde Dep. at 80-81).  Only Fuentes, Dr. Tim Reich (another orthopedic surgeon at Beth Israel), and Reich's secretary and physician assistant witnessed the incident.  (Id. at 81-82). Reich inquired whether Forde was pregnant, and DeJesus suggested that Forde take a test.  (Id. at 82).  No one told Arsht about the incident (id. at 83), and Arsht testified that he did not know that Forde had vomited at work (Arsht Dep. at 152).

The next day, Forde informed Arsht that during her lunch break she would be visiting the Women's Health Center at Beth Israel for a blood test because she "was not feeling well." (Forde Dep. at 84).  She did not mention that she thought she might be pregnant.  (Id.).  Forde received the blood test results later that day and learned that she was pregnant.  (Id. at 87). She told only Fuentes the news.  (Id. at 91).

The nurse at the Women's Health Center gave Forde a bottle of prenatal vitamins, which she took each morning at the

---

[7]     Even assuming that the meeting did not occur, Forde still has not presented sufficient evidence to warrant a trial, as discussed below.

office. (Id. at 87-88, 91). Although she kept the bottle of vitamins on her desk, no one commented about the vitamins. (Id. at 92). Forde testified that she was not sure whether Arsht, Kurlander, or Bahr saw the vitamins on her desk. (Id.).

On July 25, Forde told Arsht and Bahr that she had an appointment for a sonogram on July 27. (Id. at 94-95). She told Arsht that she "needed to check [her] stomach," but did not tell him that she was pregnant. (Id. at 96). After Forde received the results of the sonogram on July 27, she called Fuentes and Bahr to schedule a meeting with Arsht for the following morning. (Id. at 97-98).

### 5. The July 28 Meeting

On July 28, Forde, Arsht, Fuentes, and Bahr gathered in Arsht's office for a meeting. (Id. at 101-02). Forde spoke first, informing everyone present that she was pregnant and that she was planning on taking a six-week leave. (Id. at 102). Arsht first learned about Forde's pregnancy at thte meeting,[8] and he congratulated Forde on the news. (Id.). The meeting lasted

---

[8] Forde testified that she was "not sure" whether Arsht knew she was pregnant prior to the July 28 meeting, but suggests that Arsht may have known about her pregnancy before July 28 because (1) she kept prenatal vitamins on her desk, and (2) Arsht had once commented that she looked sick and pale. These speculations, however, are insufficient to impute knowledge of her pregnancy to Arsht. Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005); Burrell v. Bentsen, 91 Civ. 2654 (KMW), 1993 U.S. Dist. LEXIS 18005, *36 (S.D.N.Y. Dec. 21, 1993) ("plaintiff cannot satisfy his burden of proof by offers of speculative beliefs and gut feelings"). No reasonably jury could find, based on this surmise, that Forde had proven by a preponderance of the evidence that Arsht knew, prior to the July 28 meeting, that Forde was pregnant.

fifteen minutes, and Forde contends that no other subjects were discussed. (Id. at 103).

Defendants dispute Forde's version of what happened. Although Arsht concurs that Forde announced her pregnancy for the first time at the meeting (Arsht Decl. ¶ 18), he asserts that he conducted a staff meeting "to follow up on the performance problems" (id. ¶ 17). After Forde's announcement, Arsht "proceeded to discuss the ongoing deficiencies in [Forde's] job performance." (Id. ¶ 18). Although defendants' version of what transpired at the meeting is more credible -- it makes no sense that all these individuals met for fifteen minutes just to hear Forde's news that she was pregnant -- I accept plaintiff's version for purposes of this motion.

### 6. **Forde Is Dismissed**

Sometime after Forde's announcement, Arsht made a comment when Forde wheeled herself in her chair, instead of walking, from her desk to the filing cabinet because of a backache. Arsht told her that she "was in the way of the other staff trying to get by" and should "wear a back brace." (Forde Dep. at 148-49). Forde also contends that Arsht began criticizing her job performance only after the July 28 meeting, even though she had received emails from Arsht before the meeting indicating that he was not satisfied with the way she was performing her job.[9] (Id. at 140, 147-48; Forde Decl. ¶ 20).

_____

[9] Although Forde disputes that Arsht's emails were critical and instead interprets them as merely instructive, she

After the July 28 meeting, Arsht discovered additional mistakes made by Forde. On August 1, he discovered that a superbill and some transcribed notes were missing from a patient's chart, both tasks for which Forde was responsible. (Arsht Decl. Ex. N). On August 2, Arsht learned that Forde submitted documents to the billing company late. (See id. Ex. O). And on August 3, the transcription company emailed Arsht expressing frustration with Forde's handling of dictations. (See id. Ex. Q).

Arsht consulted James Pelligrinon, the director of labor relations, "who approved the termination of Ms. Forde based on her poor performance and the fact that she was still in her probationary period." (Id. ¶ 23).[10] On August 4, Arsht called Forde into his office to inform her that he was terminating her employment. (Forde Dep. at 158). A security guard then escorted Forde to her desk to gather her belongings before leaving the building. (Id. 159-60).

**B.    Procedural History**

On August 22, 2005, Forde filed a charge with the United States Equal Employment Opportunity Commission (the "EEOC"), alleging that she had been unlawfully fired because of

---

does not deny receiving the emails and does not contend that Arsht fabricated the emails or raised meritless issues. (Forde Dep. at 109-18).

[10]    Even assuming Pelligrinon was mistaken in his belief that Forde was still in her probationary period, there is nothing in the record to suggest that he would not have approved the termination of Forde's employment based on her performance alone.

her pregnancy.  (Compl. ¶ 6).  On November 2, 2005, the EEOC
issued a right to sue letter.  (McEvoy Decl. Ex. 7).

On January 11, 2006, Forde filed the instant action <u>pro
se</u>.  She then obtained counsel, who filed an amended complaint on
her behalf on January 29, 2007, asserting three claims:
"sex/pregnancy discrimination" in violation of Title VII of the
Civil Rights Act of 1964 ("Title VII"), the New York State Human
Rights Law (the "State Human Rights Law"), and the New York City
Human Rights Law (the "City Human Rights law") (respectively, the
first, second, and third claims).  The parties thereafter engaged
in discovery.  This motion followed.

## DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate only where the parties'
submissions "show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56(c); <u>see</u> <u>Celotex Corp. v.
Catrett</u>, 477 U.S. 317, 322-23 (1986).  Summary judgment is
inappropriate if the Court, resolving all ambiguities and drawing
all reasonable inferences against the moving party, finds that
the dispute about a material fact is "such that a reasonable jury
could return a verdict for the nonmoving party."  <u>See</u> <u>Anderson v.
Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986).

To defeat a motion for summary judgment, the nonmoving
party "must do more than simply show that there is some
metaphysical doubt as to the material facts."  <u>Matsushita Elec.</u>

-14-

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). As
the Supreme Court held in Anderson, "[i]f the evidence is merely
colorable, or is not significantly probative, summary judgment
may be granted." Anderson, 477 U.S. at 249-50 (internal
citations omitted). The nonmoving party may not rest upon mere
conclusory allegations or denials, but must set forth "concrete
particulars" showing that a trial is needed. Nat'l Union Fire
Ins. Co. v. Deloach, 708 F. Supp. 1371, 1379 (S.D.N.Y. 1989)
(quoting R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77
(2d Cir. 1984) (internal quotations omitted)). Accordingly, it
is insufficient for a party opposing summary judgment "merely to
assert a conclusion without supplying supporting arguments or
facts." BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d
603, 615 (2d Cir. 1996) (internal citations and quotations
omitted).

**B.     Pregnancy Discrimination**

   **1.     Applicable Law**

        Title VII protects individuals from discriminatory
employment practices based on sex. 42 U.S.C. § 2000e-2(a). The
Pregnancy Disability Act amended Title VII to specify that sex
discrimination includes discrimination on the basis of pregnancy.
California Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 277
(1987); § 2000e(k).

        The "ultimate issue" in any employment discrimination
case is whether the plaintiff has met her burden of proving that
the adverse employment decision was motivated at least in part by

-15-

an "impermissible reason," _i.e._, that there was discriminatory intent.  Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 119 (2d Cir. 1997); see Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146 (2000).  In the absence of direct evidence of discrimination, courts apply the burden-shifting framework set out by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  First, the plaintiff must establish a prima facie case of unlawful discrimination by showing that (1) she is a member of a protected class (2) who performed her job satisfactorily (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination.  See id. at at 802 & n.13; Kerzer v. Kingly Mfg., 156 F.3d 396, 400-01 (2d Cir. 1998) (same for pregnancy discrimination claims) (internal citations omitted).

If the plaintiff establishes a prima facie case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision."  Stratton v. Dep't for the Aging, 132 F.3d 869, 879 (2d Cir. 1997); see Reeves, 530 U.S. at 142-43.  If the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993); see James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000).

The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. See Fields, 115 F.3d at 120-21; Connell v. Consol. Edison Co., 109 F. Supp. 2d 202, 207 (S.D.N.Y. 2000). To meet this burden, the plaintiff may rely on evidence presented to establish her prima facie case as well as additional evidence, which may include direct or circumstantial evidence of discrimination. Desert Palace, Inc. v. Costa, 539 U.S. 90, 99-101 (2003); Harris v. City of New York, No. 03 Civ. 6167 (DLC), 2004 WL 2943101, at *2 (S.D.N.Y. Dec. 21, 2004). It is not sufficient, however, for a plaintiff merely to show that she satisfies "McDonnell Douglas's minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." James, 233 F.3d at 153. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. See id. at 154; Connell, 109 F. Supp. 2d at 207-08.

The McDonnell Douglas framework also applies to claims under the State and City Human Rights Law. See, e.g., Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000); Sullivan v. Newburgh Enlarged Sch. Dist., 281 F. Supp. 2d 689, 707 (S.D.N.Y. 2003). Accordingly, I discuss the Title VII, state, and city discrimination claims together.

-17-

2.   **Application**

I assume for purposes of this motion that Forde has
made a <u>prima</u> <u>facie</u> case of pregnancy discrimination.  Moreover,
defendants have met their burden of articulating a
nondiscriminatory reason for terminating Forde's employment:  her
continued poor performance.  (<u>See, e.g.</u>, Arsht Decl. ¶ 7;
Kurlander Dep. Ex. 1; <u>see generally</u> Def. Mem. at 5-8).

The issue, then, is whether Forde has presented
sufficient evidence from which a reasonable jury could find that
she was discriminated against because of her pregnancy.  In the
following analysis, I first evaluate Forde's evidence, then
defendants' evidence, and finally the record as a whole, keeping
in mind the elusiveness of proof of discrimination and the
principle that the jury is "entitled to view the evidence as a
whole." <u>Stern v. Trustees of Columbia Univ.</u>, 131 F.3d 305, 314
(2d Cir. 1997); <u>see also</u> <u>Siano v. Haber</u>, 40 F. Supp. 2d 516, 520
(S.D.N.Y. 1999).

a.   **Plaintiff's Evidence**

Forde offers the following evidence in support of her
pregnancy discrimination claim:

As evidence of discriminatory animus, Forde points to
Arsht's rebuke when she, because of back pain, wheeled herself in
her chair from her desk to the filing cabinet.  Even when viewed
in the light most favorable to her, the comment does not reveal
discriminatory animus.  At most, it may have betrayed Arsht's
annoyance with Forde for getting in the way of others in the

-18-

office, but the comment was, on its face, gender-neutral.  It only indirectly pertained to her pregnancy, in that back pain is a symptom of pregnancy, which is not "significantly probative" in supporting an inference of discrimination.  See Anderson, 477 U.S. at 249-50.  In any event, one stray comment is generally insufficient to show discrimination.  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 136 (2d Cir. 2000).

Forde also claims that Arsht began criticizing her work performance on the day she announced her pregnancy.  As discussed below, however, this evidence is severely undercut by the indisputable fact that criticisms and complaints about Forde's work performance existed long before her announcement that she was pregnant.

Finally, Forde points to the fact that she was fired one week after she announced that she was pregnant.  This timing, like the timing of Arsht's criticisms, is offered to show that her dismissal was causally related to her pregnancy and is similarly weakened by the well-documented evidence of her performance problems.

In the end, Forde has supported her claim only with the bare fact that she was fired one week after she announced that she was pregnant.  She has not presented any other evidence of discrimination, such as evidence of disparate treatment, statistical evidence, or comments betraying a pregnancy animus.

### b.  **Defendants' Evidence**

In support of their motion for summary judgment, defendants offer substantial, largely undisputed evidence that

Forde's work performance was unsatisfactory.  Defendants present
evidence that many people who dealt with Forde -- both employees
within Beth Israel and those outside the office -- complained
about her job performance.  For example, defendants have
submitted five letters from law firms and patients expressing
difficulties in receiving medical requests and pre-certifications
from Arsht's office -- tasks for which Forde was responsible.  In
addition to the complaints from patients and law firms, both
Kurlander and Bahr -- neither of whom evinced discriminatory
animus towards Forde (Forde Dep. at 44, 47)[11] -- also found the
quality of Forde's work unsatisfactory and agreed with Arsht's
decision to terminate her employment (see, e.g., Kurlander Decl.
¶¶ 2, 3; Bahr Decl. ¶ 19).

    Moreover, these complaints began shortly after her
employment began and long before anyone at Beth Israel knew that
Forde was pregnant.  Arsht's numerous communications with
Handler, Bahr, and Kurlander indicate that Arsht was concerned
with Forde's performance well before the July 28 meeting when
Forde announced her pregnancy.  In June and July, Handler
received approximately twenty phone calls from Arsht regarding

---

[11]    At her deposition, Forde testified that Bahr never
treated her unfairly or discriminated against her.  But Forde
later contradicted her prior testimony by stating that Bahr
discriminated against her by refusing to help her get disability
benefits.  (Forde Dep. at 152).  Forde cannot, however, create an
issue of fact by disputing her own prior sworn testimony.  Cf.
United Nat. Ins. Co. v. Tunnel, Inc., 988 F.2d 351, 354 (2d Cir.
1993) (party may not, to defeat a summary judgment motion, create
a material issue of fact by disputing her own prior sworn
testimony).

Forde.  Emails from Arsht to Bahr and Handler sent before July 28
clearly indicate his dissatisfaction with Forde and desire to
terminate her employment if she did not show improvement.

Finally, Arsht voiced his concerns directly to Forde
herself in several emails sent before the July 28 meeting,
pointing out tasks that Forde had not handled promptly or
properly.

### c.    **The Record As a Whole**

Considering the record as a whole, and resolving all
conflicts in the evidence and drawing all reasonable inferences
in Forde's favor, I conclude that no reasonable jury could find
that Forde's pregnancy was a factor in her dismissal.

Forde's pregnancy discrimination claim is based almost
entirely on the close temporal proximity of the termination of
her employment to the announcement of her pregnancy.  While
timing may be sufficient to establish an inference of
discrimination, "the close proximity of a termination to the
plaintiff's announcement of her pregnancy alone is insufficient
to demonstrate a pretext."  Kennebrew v. New York City Hous.
Authority, No. 01 Civ. 1654 (JSR) (AJP), 2002 WL 265120, at *16
(S.D.N.Y. Feb. 26, 2002); see also Simpson v. N.Y. State Dep't of
Civil Servs., 166 Fed. Appx. 499, 502 (2d Cir. 2006) ("While the
temporal proximity of these events gives rise to an inference of
retaliation for the purposes of appellant's prima facie case,
without more, such temporal proximity is insufficient to satisfy
appellant's burden to bring forward some evidence of pretext.").

In contrast, defendants have presented overwhelming evidence that their proffered reason for dismissing Forde was not pretext for pregnancy discrimination. In light of the well-documented evidence of Arsht's dissatisfaction with Forde's performance long before her announcement that she was pregnant, a trier of fact could not reasonably find from the timing and sequence of events that the reason for Forde's dismissal was pretextual.

Furthermore, the equally short tenure of Fuentes as Arsht's secretary dispels any notion that pregnant and non-pregnant employees were treated differently. Fuentes -- a non-pregnant employee who also did not meet Arsht's expectations[12] -- was dismissed, like Forde. (Def. 56.1 ¶ 15; Pl. 56.1 ¶ 15). Although Fuentes was fired four months after Forde, Arsht explained at his deposition that at the time Forde was fired, Fuentes had been working for only two months and that he "attributed her performance to be directly related to Ms. Forde's performance." (Arsht Dep. at 121). As a result, he wanted to "give her a chance with more time and under the guidance of a new office manager to see if she would improve." (Id.). Arsht waited four more months before firing Fuentes.

---

[12]    Arsht experienced difficulties with Fuentes as well, and several emails to Bahr and Handler regarding Forde's performance problems also mention issues with Fuentes. (See, e.g., Arsht Decl. Ex. F ("Yelena and Olivia left without checking out with me tonight. That is something I made very clear to them that I wanted them to do each night."); id. Ex. L ("I feel that I have to address Olivia and Yelena again.")).

Both Fuentes and Forde worked at Beth Israel for a total of six months, and defendants' reason for both terminations was poor performance.  The similar circumstances surrounding the dismissal of the two employees -- except that one was pregnant and the other was not -- show that defendants' treatment of an employee in a protected class did not differ from their treatment of employees not in the protected class.  See Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("[Plaintiff] has provided no indication that any evidence exists that would permit the trier of fact to draw a reasonable inference of pretext.  She has offered no evidence suggesting that . . . [similarly situated employees not in her protected class] on probation who acted similarly were retained.").  Hence, no reasonable juror could conclude that Arsht was actually motivated, at least in part, by discrimination on the basis of pregnancy and that the purported reason for the termination was pretextual.

The evidence Forde has submitted does not raise a genuine issue of material fact requiring trial.  In light of defendants' overwhelming evidence that she was fired for performance issues, Forde has not met her burden of presenting sufficient evidence from which a jury could find that more likely than not she was discriminated against because of her pregnancy.  Thus, her employment discrimination claim must be dismissed.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted.  The Clerk of the Court shall enter

judgment dismissing the amended complaint with prejudice and with costs, but without attorneys' fees. The Clerk shall close the case.

SO ORDERED.

Dated:     New York, New York
           April 22, 2008

DENNY CHIN
United States District Judge